Case No. 23-3994

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

KELLI WILSON

Plaintiff-Appellant

v.

OHIO DEPARTMENT OF MENTAL
HEALTH & ADDICTION SERVICES.

Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Case No. 2:20-CV-6184

## BRIEF OF APPELLANT KELLI WILSON

Marc D. Mezibov (OH No. 0082675)
MEZIBOV BUTLER
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
Phone: 513.621.8800
Fax: 513621.8833
mmezibov@mezibov.com

*Counsel for Plaintiff-Appellant Kelli Wilson*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, Plaintiff-Appellant certifies that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation has a financial interest in the outcome of this matter.

# TABLE OF CONTENTS

Table of Authorities ................................................................................................iv

Statement in Support of Oral Argument ....................................................................v

Statement in Support of Jurisdiction........................................................................1

Statement of the Issues Presented for Review .........................................................2

Statement of the Case................................................................................................3

Summary of the Argument.......................................................................................15

Argument..................................................................................................................17

Conclusion ...............................................................................................................30

Certificate of Compliance with F.R.A.P. 32 ...........................................................32

Certificate of Service ..............................................................................................33

Addendum ................................................................................................................34

# TABLE OF AUTHORITIES

## Cases

*Bowerman v. International Union, United Auto., Aerospace and Agricultural Implement Workers of America, Local No. 12*, 648 F.3d 360 (6th Cir. 2011) .......29

*Cheatham v. Postmaster General of United States,* 2022 WL 1073818 ................20

*Deister v. Auto Club Ins. Assoc.*, 647 Fed. Appx. 652, 658 (6th Cir. 2016) ..........24

*EEOC v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1094 (6th Cir. 1998) ..21, 24

*Employers Ins. of Wausau v. Petroleum Specialties, Inc.,* 69 F.3d 98, 102 (6th Cir. 1995).* ....................................................................................................................17

*Fisher v. Nissan,* 951 F.3d 409, ...........................................................................20

*Holmes v. Novo Nordisk Inc.*, 2022 WL 950015 (S.D. Ohio March 30, 2022). ...28, 29

*Judge v. Landscape Forms, Inc.,* 592 Fed. Appx. 403, 407 (6th Cir. 2014) ....19, 21

*King v. Steward Trumbull Memorial Hospital, Inc.*, 30 F.4th 551 560 (6th Cir. 2022)

........................................................................................................................20, 25

*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). ..............19

*Meade v. Pension Appeals and Review Committee.,* 966 F.2d 190, 192-93, (6th Cir. 1992). ...................................................................................................................17,

*Mosby-Meachem v. Memphis Light, Gas & Water Division,* 883 F.3d 595, 606 (6th Cir. 2018) ...........................................................................................................20

*Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014) .................................20

*Yarberry v. Gregg Appliances, Inc.,* 625 Fed. Appx. 729, (6th Cir. 2015) ... 21 FN 2

## Statutes/Regulations

29 CFR §1614.203 .................................................................................................24

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument would be helpful in this case due to its fact intensive nature and the numerous violations of the law that Ms. Wilson alleges.

## STATEMENT OF JURISDICTION

The United States District Court for the Southern District of Ohio had jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff-Appellant's claims arise under federal law.

This Court has jurisdiction pursuant to 21 U.S.C. § 1291, because this is an appeal as of right from a final order of the United States District for the Southern District of Ohio.  On November 28, 2023, the District Court issued a final Opinion and Order and entered judgment disposing of all parties' claims. (R. 58, Order; R. 59, Judgment).  On December 07, 2023, Plaintiff-Appellant Kelli Wilson timely filed notice of this appeal. (R. 60, Notice of Appeal).

## STATEMENT OF THE ISSUES

1. Whether the District Court erred as a matter of law in granting summary judgment in favor of ODMHAS.

2. Whether the District Court erred as a matter of law in determining that ODMHAS's repeated and continuing denials of Plaintiff's request for reasonable accommodation did not constitute a continuing violation of law.

3. Whether the District Court erred as a matter of law in determining that Plaintiff failed to engage in the interactive process, and therefore did not present sufficient facts upon which a reasonable jury could find in her favor on her claim of disability discrimination based on wrongful termination.

## STATEMENT OF THE CASE

### A. Statement of Facts.

Ms. Wilson is a qualified accountant and auditor who worked in the private sector for more than ten years before she was hired by the Ohio Department of Mental Health and Addiction Services ("The Agency") to the position of Auditor II on November 18, 2013. (Wilson Dep. R. 39 PageID 950-55, 960-962; R. 27-1 PageID 199-204).

Ms. Wilson suffers from a combination of psychiatric disorders that interfere with the normal functioning of her neurological system. Specifically, Ms. Wilson suffers from depression, attention deficit hyperactivity disorder-C ("ADHD") Generalized Anxiety Disorder ("GAD") and Obsessive-Compulsive Personality Disorder ("OCPD"). (Wilson Dep. R.. 39 PageID 983). In Ms. Wilson's case, ADHD made it more difficult for her to think linearly, leaving her susceptible to intrusive and distracting thoughts, while the symptoms of GAD for Ms. Wilson manifested themselves in the form of persistent worry and paranoia. (Amann Decl. R. 47-1 PageID 2255-56 ¶6,7). Both conditions have a synergistic effect, in that the symptoms of GAD exacerbate those of ADHD and vice-versa. (Amann Decl. R. 47-1 PageID 2255-56 at ¶9).

Ms. Wilson managed her day-to-day symptoms with medication from her psychiatrist and talk therapy with her therapist. However, even with treatment, Ms.

3

Wilson's psychiatric symptoms would flare up on an intermittent basis and at a magnitude that impeded Ms. Wilson's ability to function normally until they receded. (Wilson Dep. R. 39 PageID 988-992; Amann Decl. R. 47-1 PageID 2255-56 at ¶8-9). Ms. Wilson used medical leave on an intermittent basis to help her manage these flare-ups of her disability symptoms. (Wilson Dep. R. 39 PageID 995). Except for these periodic days of leave, Ms. Wilson was able to function normally and fulfill her essential job duties with respect to her work at the Agency. (Wilson Dep. R. 39 PageID 992). It is worthy of note that Ms. Wilson's work product never suffered through her entire employment at ODMHAS. (Wilson Dep. R.. 39 PageID 995; Lin Dep. R. 28 PageID 341; Thomson Dep. R.. 29 PageID 519).

In or about May 2016, Ms. Wilson applied for and was certified for intermittent FMLA leave to treat her episodic disability flare-ups. (Wilson Dep. R. 39 PageID 996-998; Def. R. 27-1, 2 PageID 245-255). Ms. Wilson's psychiatrist, Dr. Larry Pfahler, submitted the FMLA certification to take one day of intermittent FMLA leave every 1-2 weeks. (Wilson Dep. R. 39 PageID 1000-1003; R. 27-1 PageID 245). This request was reviewed and granted by the Agency. (R. 39-1 PageID 1195-1199). In or around August 2016, Anne Thomson, the Bureau Chief of HR for ODMHAS, met with Ms. Wilson regarding her FMLA usage. (Wilson Dep. R. 39 PageID 1004). During this meeting and despite the medical certification, Ms. Thomson accused Ms. Wilson of abusing her FMLA entitlement to take long

weekends. (Wilson Dep. R. 39 PageID 1006-1007). Ms. Thomson disbelieved that Ms. Wilson was legitimately disabled and entitled to FMLA and sent Dr. Pfahler a letter asking him to confirm and re-certify Ms. Wilson's FMLA entitlement. (Wilson Dep. R. 39 PageID 1009; Def. R.29-1 PageID 557). On August 31, 2016, Dr. Pfahler re-certified Ms. Wilson for two to four days of intermittent leave every two to eight weeks. (Wilson Dep. R. 39, PageID 1006-1007, 1128; R. 39-2, PageID 1259-1261).

In December 2016, Ms. Wilson learned that Dr. Pfahler, whom she had been seeing since 2003, had suddenly passed away. (Wilson Dep. R. 39 PageID 1016) Ms. Wilson immediately began seeking a new psychiatrist to fill in the gap in her treatment plan. (Wilson Dep. R. 39 PageID 1016). Nevertheless, Ms. Wilson lost access to medical treatment for her disorders and was forced to use a large portion of her available FMLA leave as a result. (Wilson Dep. R. 39 PageID 1016).

Because of her increased FMLA usage, Ms. Wilson was again asked to meet with Ms. Thomson and Sally Hammerstein, then the benefits coordinator for ODMHAS, on February 23, 2017. (Wilson Dep. R. 39 PageID 1015-1017; R. 27-2 PageID 260; Thomson Dep. R. 29 PageID 514). Ms. Thomson and Ms. Hammerstein notified Ms. Wilson that she had used 445.9 hours of her 480-hour FMLA entitlement and warned her that, if she ran out of FMLA, she would have no available sick leave and would face termination if she missed work. (Wilson Dep. R. 39 PageID 1016). Ms. Wilson pointedly asked Ms. Thomson and Ms. Hammerstein if

there were any other options or if there was "some other accommodation that we can work [out] so that I can keep working." (Wilson Dep. R. 39 PageID 1016-17). Ms. Wilson explained that her condition only required sporadic days off to manage instead of the large blocks of leave provided by short-term disability and she required leave on a reactive basis when she was experiencing a panic attack/flare-up, which was not possible with short term disability. (Wilson Dep. R. 39 PageID 1017-1018; Amann Decl. R. 47-1 PageID 2255-56 at ¶12). Ms. Thomson told her there was no other option: Ms. Wilson could apply for short-term disability, or she would be terminated when her disability eventually caused her to miss work. (Wilson Dep. R. 39 PageID 1017-1018). Presented with no other option, Ms. Wilson accepted short-term disability because it was the only means offered to her to obtain additional medical leave. (Wilson Dep. R. 39 PageID 1126). She served a waiting period beginning on March 17, 2017, and her benefits began on March 31, 2017. (R. 27-2 PageID 275).

When Ms. Wilson returned to work on July 7, 2017, she confirmed with the Agency that her FMLA allotment had begun to rollover, and that she had available FMLA leave. (Wilson Dep. R. 39, PageID 1050-51). Therefore, when Ms. Wilson had a flare-up, she took two days of FMLA leave on July 24 and 25, 2017, believing she had available time. (Wilson Dep. R. 39 PageID 1053). However, on July 26, 2017, Ms. Thomson informed Ms. Wilson that the Agency had made an error and

that Ms. Wilson's FMLA certification was no longer active, meaning that the two days that Ms. Wilson had called off were *not* covered by FMLA leave. (Wilson Dep. R. 39 PageID 1054; Thomson Dep. R.29 PageID 506-508-7; R. 29-1 PageID 568-570). Unbeknownst to Ms. Wilson, her use of short-term disability had dropped her below the 1250-hours-worked threshold required to be eligible for FMLA. (Wilson Dep. R. 39 PageID 1054; R. 29-1 PageID 568-570; Thomson Dep. R. 29 PageID 506-508).

Ms. Thomson told Ms. Wilson that, since she had sick leave available to cover the absences, she would not be terminated for the Agency's error. However, Ms. Wilson would not be eligible for FMLA leave until she had reached the 1250-work-hour threshold again. (Wilson Dep. R. 39 PageID 1054; R. 29-1 PageID 568-570; Thomson Dep. R. 29 PageID 506-508).  Ms. Wilson asked Ms. Thomson for a form of accommodation that would allow her to work until she could reestablish her FMLA certification. (Wilson Dep. R. 39 PageID 1114-1115; Thomson Dep. R. 39 PageID 959, 979; R. 29-1 PageID  568-570). But Ms. Thomson would not provide Ms. Wilson with any accommodation or alternative form of leave, and the meeting became confrontational. (Thomson Dep. R. 29 PageID 519). Ms. Thomson expressed skepticism at Ms. Wilson's disability, telling her that, even if she was disabled "all I know is that you're no longer able to come and go as you please, not around this office." ((Wilson Dep. R. 39 PageID 1055, 1115; Thomson Dep. R. 29

PageID 532; R. 29-1 PageID 568-570). Ms. Wilson reiterated that her treatment plan was dependent on having available medical leave, and asked to be given some form of intermittent unpaid leave until she could reestablish FMLA certification. (Wilson Dep. R. 39 PageID 1116; Thomson Dep. R. 510; R. 29-1 PageID 568-570). Ms. Thomson flatly refused and told Ms. Wilson, "[w]e're not giving you your own special bank of leave that you can use any time you want." (Thomson Dep. R. 29 PageID 510). Ms. Wilson asked Ms. Thomson to escalate her request for an accommodation to the Director of the Agency. (Wilson Dep. R. 29 PageID 1115). Ms. Thomson deflected Ms. Wilson's request and told her that she was not going to "embarrass [her]self" by talking to the Director on Ms. Wilson's behalf. (Wilson Dep. R. 39 PageID 1115).

Having been denied any route to accommodation under the Agency's policies, Ms. Wilson continued to use short-term disability to maintain her job. (Wilson Dep. R. 39 PageID 1019, R. 29-1 PageID 561-564). On March 5, 2018, Ms. Wilson emailed Ms. Winland, the Agency's Benefits Coordinator, to request extension forms for short term disability and to specifically request an "ADA reasonable accommodation, adjustment/change at work." (Wilson Dep. R. 39 PageID  1110; Def. R. 30-1 PageID 645). Ms. Winland responded by putting Ms. Wilson in contact with Maisha Jones, the ADA Coordinator for ODMHAS. (Wilson Dep. R. 39 PageID 1112; R. 30-1 PageID 645). Although Ms. Wilson had requested particular

accommodations from her supervisor and from other HR officers, this was the first time Ms. Wilson was made aware of either a so-called "ADA process" or the existence of the "ADA Coordinator" in HR. (Wilson Dep. R. 39 PageID 1131; Thomson Dep. R. 29 PageID 507).

Ms. Wilson contacted Ms. Jones, who informed her that before she could take any action to help her, her physician needed to complete additional documentation which would be passed on to a committee for consideration of the requested accommodation. (Wilson Dep. R. 39 PageID 1112-1113; Def. R. 30-1 PageID 645). Without any explanation, Ms. Jones informed Ms. Wilson that the committee would not review any of the prior medical documentation Ms. Wilson had already submitted to the Agency, save for the specific ADA form which she was providing. (Wilson Dep. R. 39 PageID 1112-23; Jones Dep. R. 30 PageID 618, 621).

Ms. Jones also informed Ms. Wilson that Anne Thomson was one of the members of the review committee. Ms. Wilson immediately asked if Ms. Thomson could be recused from the committee, and explained that Ms. Thomson had "denied significantly" her previous requests for accommodation and that she did not trust Ms. Thomson to have a role in deciding the outcome of her request. Ms. Jones refused. Even though the Agency's policies provide for the membership of the committee to be changed on a case-by-case basis, Ms. Jones did not respond to Ms. Wilson's concerns about Ms. Thomson's involvement. (Jones Dep. R. 30 PageID

606; R. 30-1 PageID 637-642; Wilson Dep. R. 39 PageID 1113, 1131). Ms. Wilson did not refuse to participate in the interactive process but persisted in her efforts to receive fair consideration by asking to have Ms. Thomson removed from the committee, whom Ms. Wilson believed in good faith harbored a discriminatory animus against her. (R. 39, PageID 1113). Accordingly, Ms. Wilson registered complaints of discrimination against Ms. Thomson with Ms. Thomson's supervisor, Vince Conner, with her own supervisor, Mr. Lin, and with the Agency's EEO officer, LaToya King. (Lin Dep. R. 28, PageID 343-345; Conner Dep. R. 32, PageID 737-738; Wilson Dep. R. 39, PageID 936, 1132; King Dep. R. 31 PageID 666-667).

Ms. Wilson returned to work on part-time disability on June 28, 2018. On July 11, Ms. Wilson had a flare-up of her condition that required her to miss work. (Wilson Dep. R. 39 PageID 1100). Ms. Wilson asked her supervisor, Mr. Lin, for accommodation in the form of approval to use personal leave in lieu of sick leave for the absence. (Wilson Dep.  R. 39 PageID 1100).

Mr. Lin initially approved Ms. Wilson's use of personal time and sick time for the absence. However, the automated timekeeping system malfunctioned and rejected Ms. Wilson's request. (Wilson Dep. R. 39 PageID 1100-1101).  When Ms. Wilson followed up with payroll regarding her available leave, Kim Sheppard, the payroll manager, directed Ms. Wilson to submit a manual leave request form to her, which she would approve so long as Mr. Lin had signed off on the request. (Wilson

10

Dep. R. 39 PageID 1102). Ms. Wilson prepared and submitted the leave form to Mr. Lin requesting to use personal time in lieu of sick leave. (Wilson Dep. R. 39 PageID 1105).

However, on August 2, 2018, Ms. Thomson personally intervened and instructed Mr. Lin, Ms. Sheppard, and Ms. Winland that they were not to approve any of Ms. Wilson's requests for leave without her personal approval. (Lin Dep. Doc 28 PageID 379; R. 27-2 PageID 257-259). Ms. Wilson was out of work on her final period of short-term disability leave, and for that reason did not find out until September 14, 2018, that her manual request for leave on July 11 had been denied by Ms. Thompson. (Wilson Dep. R. 39 PageID 1106).

Ms. Wilson exhausted her short-term disability balance on September 14, 2018, and returned to work. While doing so, Ms. Wilson sought to coordinate with her supervisor, Mr. Lin, to find an accommodation by flex her schedule in order to provide some limited accommodation for her disability. (Lin Dep. R. 28 PageID 335-336; Wilson Dep. R. 39 PageID 1117). However, on September 26, 2018, Ms. Wilson experienced a flare-up and had to miss work. She requested that Mr. Lin allow her to work extra hours in the subsequent days as an accommodation for her disability. Although he had granted this type of request in the past, Mr. Lin denied Ms. Wilson's request, again at the direction of Ms. Thomson. (R. 28-1 PageID 448-452). According to Mr. Lin, he and Ms. Thomson had discussed Ms. Wilson's use

of leave and flex time, and she had directed that Ms. Wilson would not be permitted to continue to use flex time for non-operational matters, despite the fact that Mr. Lin acknowledged granting Ms. Wilson flex-time would have not caused an undue burden on the Agency. (Lin Dep. Doc 28 PageID 335-338; R. 28-1 PageID 448-452).

Subsequently, on October 3, 2018, Laurie Spolarich, the Labor Relations Officer for the Agency asked to meet with Ms. Wilson. (Spolarich Dep. R. 27 PageID 143). Ms. Wilson believed that the purpose of this meeting was to further discuss her complaint of discrimination by Ms. Thomson, and her request that she be eliminated from the accommodations review panel. (Wilson Dep. R. 39, PageID 1138-39). Ms. Wilson was disabused of this notion when Ms. Spolarich informed Ms. Wilson that she faced disciplinary action up to and including termination for an absence dating back to July 11, 2018. (Wilson Dep. R. 39 PageID 1138-1140; Spolarich Dep. R. 27 PageID 143). Ms. Spolarich revealed that she was unaware that Ms. Wilson had complained of discrimination or requested accommodations before talking with her. (Spolarich Dep. R. 27 PageID 116). After the meeting, Ms. Wilson suffered a severe attack of her disability symptoms, and on October 9, 2018, enrolled in a rehabilitation program at the Ohio Hospital for Psychiatry. October 3, 2018 was the last day Ms. Wilson worked. (Wilson 3rd Decl. R. 56-1, PageID 2587, Amann Decl. R. 47-1 PageID 2255-56 at ¶13). While Ms. Wilson was enrolled in the

rehabilitation program, she emailed her supervisors and the Agency HR representatives to notify them of the reasons for her absence, but otherwise did not have any communications with the Agency. (Wilson Dep. R. 39, PageID 1140; R. 33-1 PageID 856).

Contemporaneously, the Agency initiated formal disciplinary proceedings against Ms. Wilson. It held a pre-disciplinary conference was on November 5, 2018. (R. 33-1 PageID 846). Ms. Wilson was unaware of this conference and did not attend, (R. 27-2, PageID 276). However, when Ms. Wilson learned that the Agency had initiated disciplinary proceedings, she retained John R. Sauter of Cloppert, Latanick, Sauter& Washburn to represent her. (*Id*; R. 54-5, PageID 2497-98). Mr. Sauter communicated with Ashley S. Hegedus, counsel for ODMHAS, on Ms. Wilson's behalf. (*Id.*). On November 27, 2018, Mr. Sauter wrote to Ms. Hegedus: "Forgot to mention one thing on the phone. If the Department does terminate Kelli Wilson's employment, can you send me a copy of the letter that is sent to Kelli? I wanted to be sure that Kelli receives the letter since she is receiving in-patient treatment at this time." (R. 54-5, PageID 2505). On December 3, 2018, the Agency terminated Ms. Wilson by letter, effective the same day, citing her absence on July 11, 2018, October 2, 2018, and the period of absence beginning on October 4, 2018,

as the basis for her termination. (R. 33-1 PageID 837-902).[1]Each of these absences was caused by Ms. Wilson's disability. (Wilson Dep. R. 39 PageID 1100; Amann Decl. R. 47-1 PageID 2255-56 at ¶13).

**B. Procedural Posture.**

On December 3, 2020, Ms. Wilson filed her Complaint and Jury Demand in the Southern District of Ohio, Eastern Division. (R. 1). On July 29, 2022, Defendant-Appellee ODMHAS filed its motion for summary judgment. (R. 43). Ms. Wilson filed her memorandum in opposition to the same on September 12, 2022. (R. 47). On February 9, 2023, the District Court issued an Order noting that ODMHAS had not asserted a statute of limitations defense in its motion for summary judgment, and granting the parties an opportunity to file supplementary briefs on that issue. (R. 51). On March 10, 2023, ODMHAS filed its revised motion for summary judgment. (R. 54). ON March 24, 2023, Ms. Wilson filed her supplemental response to summary judgment. (R. 56). On November 28, 2023, the District Court issued its Opinion and Order, granting summary judgment on all claims. (R.58, 59). On December 7, 2023, Ms. Wilson filed her notice of appeal. (R. 60).

---

[1] The Agency's process for Ms. Wilson's termination was examined following the District Court's order on February 9, 2023, at which point the Agency produced additional evidence of Mr. Sauter's communications with the Agency and the process leading to Ms. Wilson's termination. Although the Termination Letter is dated November 7, 2018 and was purportedly signed November 14, 2018, the letter—and notice of Ms. Wilson's termination, was not delivered until December 3, 2018. (R. 54-5)

## SUMMARY OF THE ARGUMENT

This appeal consists of two issues: 1) Whether the District Court erred by granting summary judgment in favor of the Agency dismissing Ms. Wilson's discrimination (wrongful termination) claim; and 2) whether the District Court erred in dismissing Ms. Wilson's failure to accommodate claim on the grounds of untimeliness. The District Court committed reversable error in dismissing Ms. Wilson's claims in both instances.

Resolution of the first issue boils down to whether the Agency acted reasonably in terminating Ms. Wilson's employment for violation of its rule prohibiting excessive absences in circumstances where, 1) it had knowledge for over two years that Ms. Wilson suffered flare ups of her physical and emotional symptoms attributable to her disability which prevented her occasionally from working for short periods of time; 2) that on multiple occasions, Ms. Wilson expressly asked her supervisors to provide her a reasonable accommodation that would afford her relief from her medical symptoms while allowing to perform her regular essential duties as a fulltime auditor; 3) that the Agency repeatedly refused her request for accommodations without demonstrating that it would suffer undue burden or hardship if any of the requested accommodations were granted; and 4) where the Agency effectively ignored its obligations under its own policy and the ADA to in good faith engage in an interactive process to agree upon reasonable

accommodations that would enable Ms. Wilson to maintain her fulltime employment.

On the second issue, the District Court erred by failing to accept jurisdiction over Ms. Wilson's failure to accommodate claim under the rubric of the "continuing violation theory." The District Court failed to credit Ms. Wilson with evidence that for more than two years the Agency rejected, denied, ignored, or deflected its responsibility as an employer to meaningfully accommodate Ms. Wilson's persistent and documented history of requesting reasonable accommodations that would allow her to maintain her employment. The Agency's wrongful actions and hostility toward Ms. Wilson were serial and continued until the day of her termination. In these circumstances, Ms. Wilson's failure to accommodate claim should not have been dismissed on the premise that to pursue these claims, Ms. Wilson was required to initiate formal actions following each instance that a request for accommodation were rebuffed. In each instance Ms. Wilson made essentially the same request to the same supervisors to accommodate her same disability for the same reason; namely, that she was capable of maintaining her regular duties if she were provided a reasonable form of short-term relief which imposed no undue burden or hardship on the Agency. Without question the Agency's persistent violations of its failure to accommodate were part and parcel of a course of a purposeful course of conduct intended to deprive Ms. Wilson of her federal rights under the ADA.

# ARGUMENT

## A. Standard of Review.

A district court's grant of Defendant-Appellee's motion for summary judgment is reviewed *de novo. Employers Ins. of Wausau v. Petroleum Specialties, Inc.,* 69 F.3d 98, 102 (6th Cir. 1995). The appellate court must affirm the district court "only if it determines that the pleadings, affidavits, and other submissions show 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (citing Fed R. Civ. P. 56(c)). When evaluating the appeal from a motion for summary judgment, the appellate court views the evidence in the light most favorable to the non-moving party. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). It is particularly important to note in this case that, "[g]ranting summary judgment is appropriate 'where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial." *Meade v. Pension Appeals and Review Committee.,* 966 F.2d 190, 192-93, (6th Cir. 1992).

## B. Disability Discrimination

Ms. Wilson's wrongful termination claim is based on the Agency's failure to accommodate her disabilities. Ms. Wilson's disabilities required her to take

17

intermittent leave during acute flare-ups of her symptoms. The Agency was well aware of the nature of Ms. Wilson's disabilities, and on multiple occasions, Ms. Wilson sought accommodations in the form of additional unpaid medical leave, a flexible schedule, or remote work. The Agency denied these accommodations and failed to engage in an interactive process with Ms. Wilson to identify potential alternative accommodations. It ultimately terminated Ms. Wilson on December 3, 2018, for disability related absences. Had the Agency accommodated Ms. Wilson by providing her with her requested accommodation, she would not have been terminated by virtue of having medical leave available to cover these absences.

Ultimately, after finding that Ms. Wilson's wrongful termination claim was timely, the District Court dismissed Ms. Wilson's the claim because Ms. Wilson ostensibly failed to participate in the interactive process. However, the record is rife with genuine issues of material fact bearing on whether the Agency acted in bad faith with respect to Ms. Wilson's attempts to engage in the interactive process. The District Court's holding that Ms. Wilson failed to participate in the interactive process was based exclusively on the Agency's the contention that Ms. Wilson's failure to submit a formal written application for accommodation constituted a refusal to seek accommodations through the interactive process. (R. 58, PageID 2629). However, Ms. Wilson never abandoned the process or her efforts to seek a reasonable accommodation. To the contrary, the record reveals that it was the

18

Agency which unilaterally obstructed and terminated the process by failing to consider medical documentation in support of Ms. Wilson's request for accommodation, failing to investigate Ms. Wilson's claim of discrimination against Ms. Thomson or recuse her from the accommodation review panel. (*See, e.g.,* Wilson Dep. R. 39, PageID 1131). In short, Ms. Wilson was never the *de facto* cause of the breakdown of the interactive process. Indeed, the law in the Sixth Circuit fully supports Ms. Wilson's argument that the Agency failed to honor its obligations under the Rehabilitation Act.

### 1. The Agency's Obligations Under the Rehabilitation Act.

The Rehabilitation Act places the initial burden of requesting an accommodation on the employee. *Judge v. Landscape Forms, Inc.,* 592 Fed. Appx. 403, 407 (6th Cir. 2014) (*Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)). However, once the employee has made her request, "the employer has a duty to engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id*. (quoting *Melange v. City of Ctr. Line*, 482 Fed. Appx. 81, 84-85 (6th Cir. 2012)). The interactive process is "informal" and "designed to encourage direct participation on behalf of both the employee and the employer." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). To this end, the employer is required to "participate in [the interactive process in] good faith and

conduct an individualized inquiry into possible accommodations." *King v. Steward Trumbull Memorial Hospital, Inc.*, 30 F.4th 551 560 (6th Cir. 2022). This duty is a "continuing mandatory duty of good-faith participation in the interactive process." *Fisher v. Nissan,* 951 F.3d 409, 422 (6th Cir. 2020) (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014)).

There is "no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation." *Judge* 592 Fed. Appx. at 407.  "If the interactive process was triggered but not successfully resolved, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Fisher,* 951, F.3d 421).  The Sixth Circuit (and others) have identified several indicators that may demonstrate a lack of good faith, including determining what accommodations the employer was willing to offer before entering the interactive process; failure to discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action against an injured employee; failing to assist an employee in seeking an accommodation; causing unnecessary delay or obstructing the process; or failing to adequately communicate or provide information during the process. *See Mosby-Meachem v. Memphis Light, Gas & Water Division,* 883 F.3d 595, 606 (6th Cir. 2018); *Rorrer,* 743 F.3d at 1040-1041; *Cheatham v. Postmaster General of United States,* 2022 WL 1073818 at *9 (6th Cir. 2022). All of these indicators are present here. Under the circumstances,

20

there is at least a genuine issue of material fact as to whether the Agency abandoned or obstructed the interactive process.

## 2. The Agency's Bad Faith.

The District Court held that Ms. Wilson failed to participate in the interactive process, but it is not clear from the record how or why Ms. Wilson fell short in this regard. She requested multiple accommodations from the Agency, made it clear that these requests were due to her medical condition, and provided medical documentation confirming the nature and extent of her disabilities. The Agency, for its part, ignored and denied out of hand over a dozen of these requests, and refused to participate in the interactive process even after Ms. Wilson requested accommodations directly from the ADA Coordinator. Yet, the District Court held it against Ms. Wilson that she did not complete an application for accommodations to the satisfaction of the Agency. But an employer cannot obstruct the interactive process by conditioning its participation on "magic words" or the form of a request.[2] *Judge* 592 Fed. Appx. at 407. Nor can an employer reject an employee's medical documentation and then refuse to participate in the interactive process on the basis that the employee has not provided medical documentation. *See, EEOC v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1094 (6th Cir. 1998)(the purpose of medical

---

[2] Indeed, the Sixth Circuit has even held that, under some circumstance, an employer may be imputed to have constructive knowledge of an employee's disability. *Yarberry v. Gregg Appliances, Inc.,* 625 Fed. Appx. 729, (6th Cir. 2015) (Employer had constructive notice of employee's disability where it knew of employee's commitment to a hospital and observed sudden onset of severe symptoms.)

certification is to "confirm or disprove" the employee's representation that she has an illness that may require special accommodation). But this is exactly what the Agency did here: it refused to submit Ms. Wilson's request for accommodation to its "ADA Committee" for consideration, ostensibly because she did not fill out and return the particular medical certification form it preferred, regardless of the fact that her physician had already submitted extensive documentation of her psychiatric conditions to the Agency. Indeed, Ms. Wilson attached a signed physician's certification for short-term disability to the very email in which she used the words "reasonable accommodation." (Wilson Dep. R. 39 PageID 1110; Def. R. 30-1 PageID 645).

In this case, the Agency arbitrarily conditioned its participation in the interactive process on Ms. Wilson's completion of a specific medical certification. This is neither good faith participation in the interactive process, nor a legitimate pre-condition to its participation in the interactive process. An employer is entitled to request medical documentation before granting an employee an accommodation, But in this case, Ms. Wilson had provided copious of medical documentation of her disabilities to the Agency through both her applications for FMLA and for short-term disability—including in the very same email in which she requested a "reasonable accommodation." (*See* R. 39-1, PageID 1188-1257; R. 39-2, PageID 1259-73).

To dispel any doubt about the sufficiency of Ms. Wilson's request, she wrote to Ms. Jones:

> The reasonable accommodation I will be requesting is for current and chronic medical condition. Previous documentation, related to condition was provided to HR within multiple disability forms and my FMLA verification. . . .I'm seeking (and per my Dr.'s recommendation) reasonable accommodation within [the] area of work schedule, flexibility, and teleworking as an appropriate adjustment from regular policy under the ADA.

(Jones Dep. R. 30 PageID 618, Exhibit 28, R. 30-1, PageID 643). Ms. Jones's response was simply to provide Ms. Wilson with an additional medical certification to complete. (Ex. 33, R. 39-2, PageID 1279, Wilson Dep. R. 39, PageID 1113). Ms. Jones testified that she was "not interested" in the medical certifications that Ms. Wilson had already provided to the Agency, did not consider Ms. Wilson's requested accommodations, and did not discuss Ms. Wilson's medical conditions with her, for no other reason than that "I am ADA coordinator, not the disability representative." (Jones Dep. R. 30 PageID 617-618). But, despite Ms. Jones' inexplicable lack of interest, Ms. Wilson clearly fulfilled her obligations under the law to request an accommodation and provide documentation of her disabling conditions. The Agency's lack of interest and refusal to engage with Ms. Wilson is without justification and counter to the purpose of the interactive process, which is "not to create impediments for such employer-employee co-operation, but to promote an interactive dialogue between an employer and employee to discover to what extent

23

the employee is disabled and how the employee may be accommodated, if at all, in the workplace." *Prevo's Family Market, Inc.,* 135 F.3d at 1095. In further support of this point, agencies covered under Rehabilitation Act are required by regulation to adopt reasonable accommodation procedures that:

> (D) Explain that an individual may request a reasonable accommodation orally or in writing at any time, **need not fill out any specific form in order for the interactive process to begin,** and need not have a particular accommodation in mind before making a request, and that the request may be made to a supervisor or manager in the individual's chain of command, the office designated by the agency to oversee the reasonable accommodation process, any agency employee connected with the application process, or any other individual designated by the agency to accept such requests;

29 CFR §1614.203(d)(3)(emphasis added). The Agency clearly did the opposite here when it refused to begin the interactive process unless and until Ms. Wilson provided it with additional, wholly unnecessary documentation. A jury could reasonably conclude from these facts that the Agency failed to participate in the interactive process in good faith.

### 3. The Agency Denied Thirteen Requests for Accommodation.

The Agency's disregard of Ms. Wilson's requests was the rule, not the exception. It denied Ms. Wilson's request for accommodation on at least twelve occasions. (*See* R. 39-2, PageID 1308-1309). Ms. Wilson identified at least thirteen requests for accommodations, each of which met the Sixth Circuit's standard to be recognized as a request for accommodation. (*Id.*; R. 58, PageID 2625 at FN 2); *See, e.g., Deister*

*v. Auto Club Ins. Assoc.*, 647 Fed. Appx. 652, 658 (6th Cir. 2016) ("Although a plaintiff need not use the word 'accommodate' or 'disability, at a minimum he must 'make it clear from the context that the request is being made in order to conform with existing medical restrictions.'") The District Court evaluated only three of these requests but did not explain why it did not consider the other ten. (R. 58 PageID 2625-2626). Regardless, the Agency made no effort to initiate the interactive process or to notify Ms. Wilson of her rights to an accommodation until Ms. Wilson stumbled upon the "magic words," and requested a reasonable accommodation. (*See, e.g.,* Winland Dep., R. 41, PageID 1775; Wilson Dep. 39, PageID 1115-1117; Thomson Dep. R. 29, PageID 496; Ex. 21, R. 29-1 PageID 568-69). The Agency's conduct is contrary to and incompatible with Sixth Circuit precedent, which explicitly holds: "[j]ust as an employee does not need to use "magic words" to inform her employer that she is disabled, the employee [also] does not need to explicitly use the word 'accommodation.'" *King*, 30 F.4th at 564.

By way of example, on or about September 26, 2018, Ms. Wilson requested her supervisor to flex her schedule as an accommodation for missing hours due to her disability. Mr. Lin initially granted his request, but then changed course and informed Ms. Wilson that she could no longer flex her schedule after discussing Ms. Wilson's request with Ms. Thomson. (Lin Dep. Doc 28 PageID 335-338; R. 28-1 PageID  448-452, Wilson Dep. R. 39, PageID 1117). This, despite the fact that Mr.

Lin had previously allowed Ms. Wilson to flex her schedule and flatly acknowledged that flex time would not impose an undue burden on the Agency. (*Id.*). This is example is typical of the Agency's conduct with respect to Ms. Wilson: it silo'd off its managers from the accommodations process and treated her requests as attempts to circumvent or violate policy, rather than as requests for medical accommodation. This kind of railroading is contrary to the requirements of the Rehabilitation Act, and is indicative of the failure of the Agency's avoidance of the interactive process.

### 4. Ms. Thomson's Obstruction of the Interactive Process.

Finally, Ms. Wilson's insistence that Ms. Thomson be recused from the ADA process was legitimate and well founded. Ms. Thomson had confronted Ms. Wilson on several occasions regarding her use of leave, accused Ms. Wilson of abusing her FMLA allowance, expressed skepticism about Ms. Wilsons's disabilities, ignored or denied multiple explicit requests for accommodations by Ms. Wilson without initiating the interactive process, and, notably, told Ms. Wilson without qualification that she was not entitled to unpaid medical leave as an accommodation for her disabilities. (*See, e.g.,* Wilson Dep. 39, PageID 1115-1117; Thomson Dep. R. 29, PageID 496; Ex. 21, R. 29-1 PageID 568-69).

Under these circumstances, it is hard to argue that Ms. Wilson's request that Ms. Thomson be recused from the ADA Committee was unreasonable; Ms. Thomson had already told her in no uncertain terms that she was not entitled to

26

unpaid medical leave as an accommodation: "[w]e're not giving you your own special bank of leave that you can use any time you want." (Thomson Dep. R. 29 PageID 510). It is also notable that Ms. Wilson's request was consistent with the Agency's written policies, which provides that membership of the committee may change "on a case-by-case basis." (Ex. 4, R. 30-1, PageID 641).

Ms. Wilson not only asked for Ms. Thomson to be removed from the process, she also complained to Ms. Thomson's supervisor, the Deputy Director of Human Resources, that Ms. Thomson was discriminating against her due to her disability and again requested that she be removed from the ADA committee. (Conner Dep. R. 32, PageID 746). Deputy Director Conner, for his part, reluctantly conceded that there may have been at least a "possibility" that Ms. Wilson complained of discrimination, but even so, he disclaimed any further recollection of the specifics of the situation for which he bore responsibility. (Conner Dep. R. 32, PageID 738). Instead, the Agency undertook no investigation of Ms. Wilson's complaints, and did not recuse Ms. Thomson from the ADA process. Under the circumstances, and in conjunction with the broader pattern of hostility demonstrated toward Ms. Wilson, it is that Ms. Thomson had resolved not to grant Ms. Wilson an accommodation even before initiating the interactive process. *See, e.g, Mosby-Meachem,* 883 F.3d 606 (6th Cir. 2018) (employer demonstrates bad faith when it determines what accommodations it is willing to offer before entering the interactive process).

27

These factors bear directly on the Agency's participation in the interactive process, and its responsibility for the process's breakdown. There is at least a genuine issue of material fact as to whether the Agency was responsible for the breakdown of the interactive process. Although the District Court's decision holds the Agency blameless in the breakdown of the interactive process solely on the strength of its perfunctory response to one of Ms. Wilson's requests, it did not address the Agency's pattern of failing to accommodate Ms. Wilson (except insofar as to hold her failure to accommodate claims to be untimely with respect to those requests) nor does it examine whether the Agency actually participated in good faith in the interactive process. It was error for the District Court not to have done so.

### C. Continuing Violation

According to the District Court the Agency's denial of Ms. Wilson's requests for accommodation was not a "continuous violation", because Ms. Wilson's requests for accommodation, and the Agency's denials, were discrete events, each of which was subject to a separate two-year statute of limitations under the Rehabilitation Act, and because the Agency's violation of the Act, "was not ongoing at the time of her termination. . ." (R. 58, PageID 2625). In so holding, the District Court committed prejudicial error.

"The continuing violations doctrine is [an] exception to the statute of limitations." *Holmes v. Novo Nordisk Inc.*, 2022 WL 950015 at *2 (S.D. Ohio March 30, 2022).

The Sixth Circuit "recognizes two categories of continuing violation. The first is 'where the plaintiff can show prior wrongful activity that continues into the present,' and the second is 'where the plaintiff can show a longstanding and demonstrable policy of discrimination.'" *Bowerman v. International Union, United Auto., Aerospace and Agricultural Implement Workers of America, Local No. 12*, 648 F.3d 360 (6th Cir. 2011) (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003)). Both "serial" and "systemic" continuing violations "operate to toll a limitations period when an employer's conduct 'represents an ongoing unlawful employment practice." *Holmes*, supra at *2 (quoting *National R.R. Passenger Corp. v. Morgan,* 122, 536 U.S. 101 at syllabus (c) (2002).

Here, Ms. Wilson documented a series of requests for accommodations, each of which was ignored or refused. Up to and until her termination, Ms. Wilson had continued to request and attempt to negotiate ODMHAS's recognition of her need for medical leave as an accommodation. The District Court acknowledges that Ms. Wilson made numerous requests for accommodation, but only considered three of Ms. Wilson's requests: first, in February 2017, when Ms. Wilson met with Ms. Thomson and Ms. Hammerstein to discuss her depleted FMLA allowance, and requested some sort of accommodation to enable her to take leave similar to FMLA; second, in July 24, 2017, when Ms. Wilson met with Ms. Thomson about her FMLA eligibility and requested unpaid medical leave as an accommodation for her

disabilities; and third, in March 2018, when Ms. Wilson explicitly requested a reasonable accommodation and was referred to Ms. Jones. (R. 58, PageID 2625-26).

This chronology is consistent with Ms. Wilson's testimony that she engaged her union and Mr. Sauter to negotiate accommodations from the Agency on her behalf. (Wilson Dep. R. 39 PageID 1153). Until December 4, 2018, when she learned of her termination, Ms. Wilson sought and reasonably expected that the Agency would follow the law and grant her requested accommodations, ratifying her use of medical leave. ODMHAS's refusal to grant Ms. Wilson's requested accommodations were not discrete, unrelated acts, but a continuing refusal by the same supervisors to engage with Ms. Wilson regarding her requests for medical accommodations. OMDHAS's persistent and ongoing failure to meet its statutory obligation to plaintiff culminated in her termination for unaccommodated medical leave which was the natural result of defendant's unwillingness to accommodate her. Under these circumstances, the District Court committed error in failing to apply the continuing violations doctrine.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Kelli Wilson respectfully requests that the Court reverse the District Court's decision granting summary judgment to ODMHAS and dismissing her claims of violations of the Rehabilitation Act.

Dated: March 5, 2024                    /s/ Marc D. Mezibov_____
                                        Marc D. Mezibov (OH No. 0019316)
                                        Mezibov Butler
                                        615 Elsinore Place, Suite 105
                                        Cincinnati, OH 45202
                                        Phone: 513.621.8800
                                        Fax: 513.621.8833

                                        *Counsel for Plaintiff-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify the following:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7086 words, excluding the parts of the brief exempted by the Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 5, 2024                    /s/ Marc D. Mezibov_____
                                        Marc D. Mezibov (OH No. 0019316)

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically field the foregoing with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit on January 24, 2024, by using the appellate CM/ECF system.  I certify that service will be accomplished on that date by the appellate CM/ECF system on the following counsel for Appellees:


Nicholas A. Cordova

Thomas Elliot Gaiser

Michael Jason Hendershot



Dated: March 5, 2024                     /s/ Marc D. Mezibov_____
                                         Marc D. Mezibov (OH No. 0019316)

**ADDENDUM**

| Docket Number | Brief Description | Page ID # |
|---|---|---|
| 1 | Complaint and Jury Demand | 1-10 |
| 43 | Motion for Summary Judgment | 1955-2000 |
| 51 | Order Regarding Limitations Period | 2271-2272 |
| 54 | Motion for Summary Judgment | 1230-1233 |
| 58 | Opinion and Order | 2608-2632 |
| 59 | Judgment Entry | 2633 |
| 60 | Notice of Appeal | 2634 |