No. 23-3994

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

KELLI WILSON,                                 :     On Appeal from the
       Plaintiff-Appellant,        :     United States District Court
v.                                            :     Southern District of Ohio
OHIO DEPARTMENT OF MENTAL                      :
HEALTH & ADDICTION SERVICES,                   :     District Court Case No.
      Defendant-Appellee.            :     2:20-cv-06184
                                              :
                                              :
                                              :
                                              :

---

## BRIEF OF APPELLEE

---

DAVE YOST
Ohio Attorney General

T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record*
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
NICHOLAS A. CORDOVA
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
Thomas.Gaiser@OhioAGO.gov

*Counsel for Appellee*
 *Ohio Dept. of Mental Health*
 *& Addiction Services*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ...........................................vi

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES ........................................................................2

INTRODUCTION .............................................................................................3

STATEMENT OF THE CASE ...........................................................................3

STANDARD OF REVIEW ...............................................................................10

SUMMARY OF THE ARGUMENT .................................................................10

ARGUMENT...................................................................................................13

    I.    All of Wilson's claims fail on the merits because she was not "otherwise qualified," as her insistence on an unreasonable accommodation demonstrates................................................................13

        A.    Both wrongful-termination and failure-to-accommodate claims require a showing that the plaintiff was "otherwise qualified." .........13

        B.    Wilson was not "otherwise qualified" to continue serving as an external auditor................................................................................15

            1.    Regular attendance is an essential function of the external auditor position............................................................................15

            2.    Reliably performing substantial auditing work on-schedule is an essential function of the external auditor position. ......................17

            3.    Wilson's own evidence shows she could not regularly attend work or perform substantial auditing work on a predetermined schedule.................................................................................18

        C.    Wilson never identified a "reasonable" accommodation. .................21

II.     Even if Wilson was a "qualified individual," her claims still fail because she broke-off the interactive process. .....................................26

    A.     Wilson's own conduct defeats her federal failure-to-accommodate claim. ...............................................................................27

    B.     Wilson's own conduct also defeats her wrongful-termination claims...................................................................................29

III.    The statute of limitations bars Wilson's federal failure-to-accommodate claim. ............................................................30

IV.     State sovereign immunity allows this Court an alternate path to affirm the district court's rulings on Wilson's state-law claims, but the Court should affirm for the reasons the district court provided. .......................31

    A.     The Court should affirm under the prevailing view...........................32

    B.     Wilson is entitled to no relief under the outlier view. ........................33

V.      Wilson's counterarguments are unavailing. ..........................................34

    A.     Wilson offers no counterargument that she was "otherwise qualified."...............................................................................34

    B.     Had Wilson stated a prima-facie case, she still could not avoid responsibility for the breakdown in the interactive process. ..............35

    C.     Wilson's federal failure-to-accommodate claim fails even under a continuing-violation theory.................................................39

CONCLUSION......................................................................................40

CERTIFICATE OF COMPLIANCE.....................................................42

CERTIFICATE OF SERVICE ..............................................................43

DESIGNATION OF DISTRICT COURT RECORD..........................................44

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Ansonia Bd. of Educ. v. Philbrook,*
    479 U.S. 60 (1986) ........................................................................ 38

*Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.,*
    42 F.4th 568 (6th Cir. 2022) ................................................... 14, 30

*Cady v. Arenac Cnty.,*
    574 F.3d 334 (6th Cir. 2009) .......................................................... 33

*City of Columbus Civ. Serv. Comm'n v. McGlone,*
    82 Ohio St. 3d 569 (1998) .............................................................. 11

*Does 1-5 v. Whitmer,*
    69 F.4th 300 (6th Cir. 2023) .......................................................... 33

*Doherty v. S. Coll. of Optometry,*
    862 F.2d 570 (6th Cir. 1988) ................................................... 14, 30

*EEOC v. Ford Motor Co.,*
    782 F.3d 753 (6th Cir. 2015) ................................................... *passim*

*Endres v. Ne. Ohio Med. Univ.,*
    938 F.3d 281 (6th Cir. 2019) .......................................................... 31

*Fisher v. Nissan N. Am., Inc.,*
    951 F.3d 409 (6th Cir. 2020) ................................................... 12, 15

*Gantt v. Wilson Sporting Goods Co.,*
    143 F.3d 1042 (6th Cir. 1998) ........................................................ 20

*Hankins v. Gap, Inc.,*
    84 F.3d 797 (6th Cir. 1996) ............................................................ 38

*Hedrick v. W. Rsrv. Care Sys.,*
    355 F.3d 444 (6th Cir. 2004) .......................................................... 29

*Holmes v. Novo Nordisk Inc.,*
    2022 WL 950015 (S.D. Ohio Mar. 30, 2022) ................................. 40

*Hoskins v. Oakland Cnty. Sheriff's Dep't,*
    227 F.3d 719 (6th Cir. 2000) .................................................... 24-25

*Judge v. Landscape Forms, Inc.*,
  592 F. App'x 403 (6th Cir. 2014) ...................................................... 37

*Kaltenberger v. Ohio Coll. of Podiatric Med.*,
  162 F.3d 432 (6th Cir. 1998) ...................................................... 25, 26

*Keith v. Cnty. of Oakland*,
  703 F.3d 918 (6th Cir. 2013) ...................................................... 35, 36

*King v. Steward Trumbull Mem'l Hosp., Inc.*,
  30 F.4th 551 (6th Cir. 2022) ........................................................ 22

*Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs*,
  974 F.3d 652 (6th Cir. 2020) ................................................... *passim*

*Kleiber v. Honda of Am. Mfg.*,
  485 F.3d 862 (6th Cir. 2007) ................................................. 10, 27, 37

*Ku v. Tennessee*,
  322 F.3d 431 (6th Cir. 2003) ........................................................ 34

*McPherson v. Mich. High Sch. Ath. Ass'n*,
  119 F.3d 453 (6th Cir. 1997) ...................................................... 11, 30

*Melange v. City of Center Line*,
  482 F. App'x 81 (6th Cir. 2012) ..................................................... 24

*Nair v. Oakland Cnty. Cmty. Mental Health Auth.*,
  443 F.3d 469 (6th Cir. 2006) ...................................................... 33, 34

*Rorrer v. City of Stow*,
  743 F.3d 1025 (6th Cir. 2014) ....................................................... 41

*Russell v. Lundergan-Grimes*,
  784 F.3d 1037 (6th Cir. 2015) ....................................................... 32

*Sevier v. Turner*,
  742 F.2d 262 (6th Cir. 1984) ........................................................ 32

*Tchankpa v. Ascena Retail Grp., Inc.*,
  951 F.3d 805 (6th Cir. 2020) ...................................................... 16, 39

*Thompson v. Fresh Prods., L.L.C.*,
  985 F.3d 509 (6th Cir. 2021) ...................................................... 35, 41

*Timmer v. Mich. DOC*,
  104 F.3d 833 (6th Cir. 1997) ........................................................ 33

*United Paperworkers Int'l Union v. Inland Paperboard & Packaging, Inc.*,
   25 F. App'x 316 (6th Cir. 2001) ........................................................ 24

*Walsh v. UPS*,
   201 F.3d 718 (6th Cir. 2000) .................................................... 22, 24

## Statutes and Rules

21 U.S.C. §1291 ........................................................................... 1

28 U.S.C. §1331 ........................................................................... 1

28 U.S.C. §1367 ........................................................................... 1

29 U.S.C. §701 ............................................................................. 9

29 U.S.C. §794 ....................................................... 11, 14, 16, 30

29 C.F.R. §1614.203 ................................................................ 37

29 C.F.R. §1630.2 ............................................................. 16, 27

42 U.S.C. §12111 ................................................ 11, 15, 16, 35

42 U.S.C. §12112 ..................................................................... 22

Ohio Admin. Code 123:1-32-02 ........................................... 23

Ohio Rev. Code §4112.02 ................................... 9, 13, 19, 21

## STATEMENT REGARDING ORAL ARGUMENT

The Ohio Department of Mental Health & Addiction Services (the "Department") agrees that oral argument would assist the Court in navigating the various avenues by which it might resolve this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331 and 1367, and it acted within its discretion in addressing the state-law claims without raising state sovereign immunity *sua sponte*.  This Court has jurisdiction under 21 U.S.C. §1291 because the district court disposed of all claims as to all parties.  The district court's decision issued on November 28, 2023, and Plaintiff Kelli Wilson timely appealed on December 7, 2023.

## STATEMENT OF THE ISSUES

**1.** Whether the district court properly granted the Department summary judgment on Wilson's disability-discrimination/wrongful-termination claims brought under the Rehabilitation Act and Ohio law.

**2.** Whether the district court properly granted the Department summary judgment on Wilson's Rehabilitation Act failure-to-accommodate claim.

**3.** Whether the district court had discretion to consider the timeliness and merits of Wilson's state-law claims when the Department did not raise state sovereign immunity to those claims.

## INTRODUCTION

Kelli Wilson asks this Court to say that the law requires her employer to grant her an accommodation of unlimited, unplanned leave.  She already exhausted her FMLA leave, did not work enough to earn more, and exhausted a lifetime of disability leave.  Still, she believes the law demands that her employer grant even more leave.  But she refused her ADA Coordinator's invitation to request an accommodation.  The likely reason for her refusal is that she cannot identify any accommodation that would enable her to perform her work, which requires close coordination with her three team members to conduct on-site audits at facilities throughout Ohio.

According to Wilson, her disability temporarily incapacitates her at times and for durations that no one can predict.  While symptoms last, she can do no work at all.  Wilson nevertheless sued when her employer eventually terminated her for violating an attendance policy and a last-chance agreement.  Her claims must fail because she was not "otherwise qualified"—indeed, she is unable under any circumstances—to perform her job's essential functions.  There are alternative avenues for the Court to reach this conclusion, but all roads will lead the Court to affirm.

## STATEMENT OF THE CASE

**1.** Appellant Kelli Wilson worked as an external auditor for the Ohio Department of Mental Health and Addiction Services from 2013 to 2018, where she

monitored other public entities' use of Department funds. Wilson Depo., R.39, PageID#958; Ex.35, R.39-2, PageID#1285. Well before joining the Department, Wilson suffered from anxiety, depression, ADHD-C, and obsessive-compulsive personality disorder. Wilson Depo., R.39, PageID#982–83. When these conditions flare-up, Wilson says, the effects "will be strong enough" that she cannot do things like "showering often enough" and "unloading the dishes." *Id.* at 992. Her doctor agrees that these flare-ups "render her temporarily incapacitated." Dr. Amann Decl., R.47-1, ¶9, PageID#2256.

Despite these episodes, Wilson was confident she could manage them when she joined the Department. Wilson's job required her to "conduct[] site-visits of structured programs" and "work cooperatively with members of audit teams & customers." Ex.2, R.39-1, PageID#1184–85. About every other month, external auditors travel in teams of two to spend a continuous work week performing on-site audits at county mental health boards throughout Ohio. Wilson Depo., R.39, PageID#966–68. Auditors spend the rest of their time working in an office in teams of four. *Id.* at 968. For years, Wilson was able to perform these duties, using standard sick leave and personal time to manage her conditions.

Then, in 2016, Wilson's symptoms worsened, so she applied for additional leave under the Family Medical Leave Act. Ex.6, R.39-1, PageID#1199. She received

approval for a modified work schedule that allowed her one day off every one-to-two weeks. Wilson Depo., R.39, PageID#1001–03, 1199. Months later, she received approval for two-to-four days off every two-to-eight weeks. *Id.* at 1010–12; Ex.7, R.39-1, PageID#1200, 1205.

While on the first modified schedule, Wilson claimed to have worked two days that she actually took off, a violation of Department Policy that warranted termination. Ex.3, R.39-1, PageID#1186–87; Wilson Depo., R.39, PageID#971–73. To keep her job, she signed a last-chance agreement promising to "[s]trictly adhere to the agency's time and attendance policies" on the understanding that "any violation of policies or work rules will result in termination of employment." Ex.3, R.39-1, PageID#1186–87. That agreement remained in effect through the remainder of Wilson's employment. *See id.*

**2.** By late February 2017, Wilson had used 445.9 of the maximum annual 480 hours of FMLA leave. Wilson Depo., R.39, PageID#1015–17; Ex.9, R.29-1, PageID#565. At that time, HR Bureau Chief Anne Thomson told Wilson that Wilson would not become re-eligible for FMLA until May, and advised her that she could apply for short-term disability to bridge the gap if needed. Ex.9, R.29-1, PageID#565; Wilson Depo., R.39, PageID#1017–19. Wilson's response, in her words: she was "almost adamant"; "[t]hat's not what I wanted." Wilson Depo.,

R.39, PageID#1017.  Wilson instead preferred "more unpaid leave days" to use just like sick days—at any time, and without the prior notice necessary for disability leave. *Id.* at 1017–18.  When the Department told her that was not an option, Wilson applied for and began using short-term disability.  *E.g.*, Ex.12, R.39-1, PageID#1239.  She exhausted her 2080-hour lifetime maximum of disability leave within a year and a half. Ex.31, R.39-2, PageID#1278.  That is, she worked about one-third of a regular schedule.

**3.**  In July 2017, a Department employee mistakenly told Wilson that she was eligible for FMLA again.  *E.g.*, Thomson Depo., R.29, PageID#491–92.  Wilson missed work July 24 and 25th and logged it as FMLA time.  In response, HR Chief Thomson met with Wilson to explain the Department's error, and to assure Wilson that everything would "work out" because the Department excused the absences without penalty.  Wilson Depo., R.39, PageID#1052–56; Thomson Depo., R.29, PageID#494–95. Wilson then again asked for an inexhaustible bank of unpaid leave to use like never-ending FMLA, Wilson Depo., R.39, PageID#1116; Thomson Depo., R.29, PageID#507; Ex.21, R.29-1, PageID#568, and threatened to sue the Department because of its mistake, Thomson Depo., R.29, PageID#500; Ex.21, R.29-1, PageID#568.  Thomson responded that it would be unfair to other employees to allow Wilson alone to take unpaid, unscheduled leave without any limit. Ex.21, R.29-

1, PageID#568.  Wilson used part- or full-time disability for most of the remainder of 2017.  Order on MSJ, R.58, PageID#2610.

**4.** In March 2018, Wilson emailed an HR analyst to check the status of disability-recertification forms she submitted after close-of-business on the night of the deadline for continuing short-term disability leave.   Ex.29, R.39-2, PageID#1274–75.  Also in that email, Wilson decided to "request ADA reasonable accommodation, adjustment/change at work."  *Id.* at 1274.  The analyst responded minutes later with an email urging Wilson to "please email" "Maisha Jones," the Department's "Reasonable Accommodation coordinator."  *Id.*

Wilson did email Jones, who promptly sent Wilson the ADA reasonable-accommodation paperwork and instructions for completing it.   Ex.33, R.39-2, PageID#1281.  Wilson responded with some additional questions that Jones answered a few days later.  *Id.* at 1280.  Then—silence.  Jones waited two weeks, and then sent a follow-up email "to see if [Wilson] ha[d] any other questions" and invited her to "[f]eel free to call or e-mail if you do."  *Id.* at 1282.  Wilson never returned the paperwork.  Wilson Depo., R.39, PageID#1112.  She explained in her deposition that she had decided against "[g]oing through that route."  *Id.* at 1131.

Wilson nonetheless kept calling-off work regularly, using all her accumulated sick leave before July 11, 2018.  On that day, she called off and told her supervisor

that she had sufficient sick leave to cover the absence even though she did not.  Lin Decl., R.54-1, ¶¶10–11, PageID#2330–31.  That unexcused absence violated her last-chance agreement.  *See* Ex.3, R.39-1, PageID#1186–87.  But Wilson's absences continued.  She called-off on July 18 because she had a flat tire.  Wilson Depo., R.39, PageID#1099.  On July 25, she told her supervisor she could not come to work because her ceiling was leaking.  *Id.*  On August 2, a leaky toilet prevented her from coming in.  *Id.*  She did not return to work thereafter until September, because she went on full-time disability the next day until she had used her lifetime maximum.  Lin Decl., R.54-1, ¶13, PageID#2331; Ex.31, R.39-2, PageID#1278.

**5.**  Wilson's unexcused absence on July 11 triggered a Department investigation.  Spolarich Decl., R.54-3, ¶¶7–9, PageID#2398.  The Labor Relations Officer conducting the investigation met with Wilson when she returned from disability leave on October 3, 2018.  *Id.* at ¶14.  The officer requested that Wilson provide a written statement about her unexcused absence.  *Id.*  Wilson never provided a statement, *id.* at ¶17, nor returned to work after that day, Lin Decl., R.54-1, ¶¶16–17, PageID#2332.  Her absences from October 4 through her December 3 termination were all unexcused.  Ex.B, R.54-3, PageID#2403.

The Department held a pre-disciplinary hearing on November 5, 2018.  Spolarich Decl., R.54-3, ¶¶21–23, PageID#2400.  Wilson was notified but did not attend.

*Id.* A termination letter signed November 14, 2018 informed Wilson that she would be removed from her position effective December 3, 2018. Ex.E, R.54-3, PageID#2468. Wilson received this letter by email on December 4, 2018. 3d Wilson Decl., R.56-1, ¶7, PageID#2588. Wilson filed this lawsuit on December 3, 2020 alleging four claims: (1) disability discrimination/wrongful termination under the Rehabilitation Act, 29 U.S.C. §701, *et seq.*; (2) disability discrimination/wrongful termination under Ohio Rev. Code §4112.02, *et seq.*; (3) failure to accommodate under the Rehabilitation Act; and (4) failure to accommodate under Ohio Rev. Code §4112.02. Compl., R.1, PageID#7–8. Wilson's Complaint also pleaded claims for retaliation in violation of state and federal law, Compl., R.1, PageID#8–9, but she waived those claims by notifying the district court of her intention to abandon them in her response to the Department's motion for summary judgment. Opp. to MSJ, R.47, PageID#2230 n.1. That motion did not mention state sovereign immunity.

**6.** The district court granted the Department summary judgment on the federal and state-law wrongful termination claims as well as the federal failure-to-accommodate claim, and declined supplemental jurisdiction over the state-law failure-to-accommodate claim after finding it was not time-barred. The district court found that Wilson's federal and state wrongful termination claims failed because "it was Wilson herself who caused a breakdown in the interactive process" in March 2018.

Order on MSJ, R.58, PageID#2629.  As for the federal failure-to-accommodate claim, the court ruled that it was time-barred because each of Wilson's alleged ADA-accommodation requests was allegedly denied more than two years before she filed her Complaint.  *Id.* at 2623–2626.  Having thus disposed of the federal claims, the district court declined supplemental jurisdiction to resolve the state failure-to-accommodate claim, citing considerations of comity and noting that "Wilson has the opportunity to refile this claim in state court."  *Id.* at 2631.  Wilson appealed.

## STANDARD OF REVIEW

This Court will "review de novo a district court's order granting summary judgment, … [and will] view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

## SUMMARY OF THE ARGUMENT

All of Wilson's claims fail for one reason—she was not a "qualified individual" during the relevant timespan.  That conclusion resolves all claims thanks to the confluence of two factors.

First, analysis of the state and federal claims merges, and ADA case law is "instructive in construing" all of them.  *See McPherson v. Michigan High Sch. Ath. Ass'n*, 119 F.3d 453, 460 (6th Cir. 1997) (en banc) (standards for Rehabilitation Act

claims track ADA claims); *Columbus Civil Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 571 (1998) (same for Ohio disability-discrimination claims).

Second, Wilson's wrongful-termination claims and failure-to-accommodate claims share a common element that requires Wilson to provide prima-facie evidence that she "was otherwise qualified for her position, with or without reasonable accommodation" at the time of termination and the alleged accommodations denials, respectively. All Wilson's claims fail on that element—she was not "otherwise qualified for her position."

The Rehabilitation Act protects only disabled "qualified individual[s]." 29 U.S.C. §794(a). A "qualified individual" is someone who "can perform the essential functions of the employment position" either "with or without a reasonable accommodation." 42 U.S.C. §12111(8). And an accommodation that "remov[es] an essential function from the position … is *per se* unreasonable." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (quotation and brackets omitted). The very work-modifications Wilson demanded reveal that she cannot perform the essential functions of consistently attending work and keeping a predetermined work schedule. She demanded unrestricted leave and consistently maintained that she could not perform these essential functions with any accommodation the Department

might provide. She therefore failed to make a prima-facie showing that she is a "qualified individual."

Wilson's federal failure-to-accommodate claim falls short for two additional reasons—her own conduct and the statute of limitations. First, even if Wilson were a "qualified individual," she could not prevail without showing that, after notifying the Department of her disability, she "participate[d] in good faith" "in an interactive process" to agree upon an accommodation. *Fisher v. Nissan N. Am., Inc.,* 951 F.3d 409, 421 (6th Cir. 2020) (quotation omitted). Wilson withdrew from this interactive process—and sank her failure-to-accommodate claim—when she failed to return ADA paperwork needed to identify an appropriate accommodation and document its medical necessity.

Second, Wilson's federal failure-to-accommodate claim is untimely because the two-year limitations period expired between the last alleged denial of an accommodation request, in October 2018, and the date she filed this lawsuit, December 3, 2020. And the Department did not cross-appeal the district court's no-prejudice dismissal of Wilson's state failure-to-accommodate claim.

Finally, this Circuit's precedent allowed the district court to rule on Wilson's state-law claims, sovereign immunity notwithstanding, because the Department did not raise immunity to those claims in district court.

12

For these reasons, this Court should affirm.

## ARGUMENT

**I.    All of Wilson's claims fail on the merits because she was not "otherwise qualified," as her insistence on an unreasonable accommodation demonstrates.**

The central reason Wilson's claims lack merit is that, if Wilson got what she wanted, her job would not be an external auditor, but a new position of her own making.  The Rehabilitation Act and Ohio Revised Code §4112.02 provide two ways to articulate that conclusion.  This Court could hold either that Wilson is not a "qualified individual" or that she failed to propose an accommodation that is "reasonable," or both.  The "qualified individual" path is the straightest of the alternative routes to affirming the district court.

### A. Both wrongful-termination and failure-to-accommodate claims require a showing that the plaintiff was "otherwise qualified."

Wilson's wrongful-termination claims require prima-facie evidence "(1) that [s]he is disabled, (2) that [s]he is otherwise qualified for the job, with or without reasonable accommodation, (3) that [s]he suffered an adverse employment action, (4) that h[er] employer knew or had reason to know of h[er] disability, and (5) that, following the adverse employment action, either [s]he was replaced by a nondisabled person or h[er] position remained open." *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 578 (6th Cir. 2022).  These claims also require a showing that Wilson

was terminated "solely by reason of" her disability. *E.g.*, *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988); 29 U.S.C. §794. Similarly, a failure-to-accommodate claim requires a prima-facie showing "that (1) she was disabled within the meaning of the ADA, (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 669 (6th Cir. 2020).

These claims' common "otherwise qualified" element is the focus of this appeal. A plaintiff bears "the burden of establishing … that [s]he is 'otherwise qualified' for the position" of external auditor by showing she can perform each of the job's essential functions if given an appropriate accommodation. *Fisher*, 951 F.3d at 417 (quotation omitted). But the employer must establish which job functions are "essential." *Id.* This Court has offered examples of essential functions. Consider "a school that lacked an elevator to accommodate a teacher with mobility problems. It could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class after he took too long to climb the stairs between periods. In other words, even though presence in the classroom when the bell rings is an attendance requirement, a tardy teacher is not unqualified if his tardiness results

from his employer's unwillingness to accommodate.  If, by contrast, no reasonable accommodation would cure the attendance problem—as, for example, when an employee is not medically cleared to work at all, or blames his absences on car problems rather than disability—the employee is not qualified." *Id.* at 418 (quotation and citations omitted).  Here, no reasonable accommodation would cure Wilson's attendance problems or enable her to keep a hybrid schedule.

### B. Wilson was not "otherwise qualified" to continue serving as an external auditor.

To show that she was "otherwise qualified," Wilson needed to show that she could perform an external auditor's essential functions with or without a reasonable accommodation.  42 U.S.C. §12111(8).  All evidence shows the opposite—no accommodation would enable Wilson to perform the essential functions of reliably attending work and keeping a substantial predetermined work schedule.

### 1. Regular attendance is an essential function of the external auditor position.

Disabled individuals need only perform essential functions to gain legal protection as a "qualified individual," 42 U.S.C. § 12111(8); 29 U.S.C. §794.  A job function is "essential" if removing it fundamentally alters the position. *Ford Motor*, 782 F.3d at 762 (citing 29 C.F.R. §1630.2(n)(1)).  ADA cases establish a "general rule—that regularly attending work on-site is essential to most jobs." *Id.* at 761.

That includes "regular and *predictable* on-site attendance." *Id.* at 762 (emphasis added). In fact, this Court "presume[s] on-site attendance is an essential job requirement." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 813 (6th Cir. 2020). ADA regulations elaborate that two of the factors relevant to a job requirement's essentiality are "[w]ritten job descriptions" and "[t]he employer's judgment." 29 C.F.R. §1630.2(n)(3). The Department has shown that regular, in-person work attendance is an essential function under this standard.

Begin with Wilson's "Position Description." It lists first among "Job Duties in Order of Importance" that an external auditor "conducts site-visits of structured programs," which requires auditors to "work cooperatively with members of audit teams & customers" at locations far from the auditor's home. Ex.2, R.39-1, PageID#1185. Anyone unable to regularly attend uninterrupted on-site workweeks cannot perform this duty, the primary function of external auditors. And reliable in-office presence greatly facilitates "work[ing] cooperatively with members of audit teams," all of whom are at the office.

The Department's judgment further confirms that regularly coming to work is essential to being an external auditor. Amended MSJ, R.54, PageID#2313–2315 (citing record depositions and declarations). Attendance is essential because "absenteeism ha[s] a detrimental effect on the audit team's efficiency." *Id.* at 2315; *see*

16

Lin Decl., R.54-1, PageID#2329.  Any external auditor's excessive unplanned non-attendance leaves the three remaining members of her four-person team in a bind, especially because the team needs to plan sustained weeklong audits at locations throughout the State.  *See* Wilson Depo., R.39, PageID#966–68.  As Wilson's direct supervisor explained, "[w]hen Ms. Wilson was absent, the work she was assigned … was delayed or it had to be reassigned to another team member who would need to completed [sic] the workload alone; a reassignment resulted in an increased work load on the other staff and also slowed the productivity of the team."  Lin Decl., R.54-1, ¶7, PageID#2329–30.

The external auditor position's travel, scheduling, and teamwork require-ments make in-person attendance an essential function.

### 2.    Reliably performing substantial auditing work on-schedule is an essential function of the external auditor position.

Even if the Department had not shown that regular attendance is an essential function of being an external auditor, it still showed that reliably doing pre-scheduled work *at all* is an essential function of external auditors.  Wilson does not and cannot contend that an external auditor need not reliably perform sustained periods of au-diting work at times set by the Department beforehand.  External auditors must work in synchrony with members of their team and audited organizations, Ex.2, R.39, PageID#1185, who need to know when the auditor will be available.

17

More important still, keeping a preset schedule is necessary for effective and equitable allocation of work among team members. *See* Lin Decl., R.54-1, ¶7, PageID#2329. The nature of an external auditor's work heightens this need. The audited county mental health boards are "divided equally" among the four "fiscal auditor team members" and the work must be completed in time to schedule annual "[o]n-site audits" at each of the "50-54" boards. Lin Decl., R.54-1, PageID#2329. That task requires external auditors to perform substantial volumes of work at preset times to ensure that it all gets done on time without overburdening the three remaining team members. Anyone unable to audit for sustained periods at pre-scheduled times is not qualified to be an external auditor.

> ### 3. Wilson's own evidence shows she could not regularly attend work or perform substantial auditing work on a predetermined schedule.

Wilson's demonstrated inability to regularly attend work and to keep a substantial predetermined work schedule precludes her from performing the essential functions of external auditors. She was thus unqualified to work as an external auditor with any conceivable accommodation, including the accommodation she demanded. Her lack of qualification, in turn, places her outside the scope of the Rehabilitation Act and Ohio Rev. Code §4112.02's protection and entitles the Department to summary judgment on her claims.

The record leaves no doubt that Wilson could not regularly attend work with any accommodation.  In the nine months between May 13, 2016 and February 23, 2017, Wilson needed to take off an average of nearly one and one-half days in every five, totaling 445.9 hours—nearly 50 hours per month and about 30% of the working hours of a full-time employee.  Ex.5, R.39-1, PageID#1199, 1207.  That figure does not account for the time she took off using ordinary leave, like sick days and personal time.  For the next year and a half, Wilson did not have an ostensible full-time schedule at any time between March 17 and May 31, 2017 or between September 15, 2017 and September 15, 2018.  Order on MSJ, R.58, PageID#2610–11.  And she could not keep up even a modified part-time schedule.  *E.g.*, Lin Decl., R.54-1, ¶7, PageID#2329; Wilson Depo., R.39, PageID#1077–78.

Critically, the "accommodations" Wilson allegedly requested would not have enabled her to regularly attend work.  Her alleged requests for remote work (that her incapacitating disability would still have prevented her from performing) and more time off would have resulted in exactly that—more, rather than less, time away from work.  And Wilson could never give any indication of when or if her need for frequent, unscheduled absences would abate.  Wilson was not "otherwise qualified" as an external auditor because she could not meet the position's attendance

requirements, *see Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998), even if the Department had given her the infinite unpaid leave she demanded.

Although Wilson's inability to regularly *attend* work defeats her claims, the evidence also shows that she could not reliably *perform* auditing work according to any substantial set schedule, and that no accommodation would enable her to do so. Wilson's symptoms are too unpredictable for anyone to determine when a flare-up will occur. Wilson Depo., R.39, PageID#1078, 1118. And when flare-ups do occur, they "render" Wilson "temporarily incapacitated," Dr. Amann Decl., R.47-1, ¶9, PageID#2256, preventing her from performing "complete … daily life activities" like "showering often enough" and "unloading the dishes," let alone auditing state-funded organizations' finances. Wilson Depo., R.39, PageID#992–93. So Wilson could not realistically work from home even if the external auditor's small-team setting and travel requirements did not "require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation." *Ford Motor*, 782 F.3d at 761 (quotation omitted).

The severity of her disability is also why Wilson said in her deposition that she cannot work a part-time schedule, Wilson Depo., R.39, PageID#1077–78, or make flextime work, *id.* at 1118. And all her vacation, personal, and sick time combined

did not cover anything like the 50 hours per month her symptoms prevented her from working. *See, e.g,* Order on MSJ, R.58, PageID#2610; Wilson Depo., R.39, PageID#1015. Nor was it sufficient to cover the absences Wilson accrued before the Department terminated her employment. Ex.16, R.29-1, PageID#561–64. There is no question that Wilson could not sufficiently contribute to a team of four auditors no matter what accommodation the Department might have given her. In legal terms, she was not "qualified" under the Rehabilitation Act and Ohio Rev. Code §4112.02.

### C. Wilson never identified a "reasonable" accommodation.

Another way of expressing the reason Wilson's claims cannot proceed is that the single accommodation she was willing to accept—unlimited, unscheduled, unpaid leave—is not "reasonable" as a matter of law. Wilson Depo., R.39, PageID#1017. "The burden of establishing that the proposed accommodation is reasonable remains with the plaintiff … . This logically flows from the fact that the plaintiff is always required to show that he or she is qualified for the position, with or without reasonable accommodation." *Walsh v. United Parcel Serv.*, 201 F.3d 718, 725–26 (6th Cir. 2000) (citing 42 U.S.C. §12112(b)(5)(A)). Again, an accommodation that removes an "essential function" is "*per se* unreasonable." *Ford Motor*, 782 F.3d at 761. Because unpaid leave for undefined days and duration is an unreasonable

request, *see Walsh*, 201 F.3d at 725–28, the Department did not discriminate against Wilson by denying it.

Drilling down a layer further reveals why Wilson's request is unreasonable. "When assessing reasonableness [of medical claims], this Court considers: (1) the amount of leave sought; (2) whether the requested leave generally complies with the employer's leave policies; and (3) the nature of the employee's prognosis, treatment, and likelihood of recovery." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 562 (6th Cir. 2022) .

All three factors illuminate the unreasonableness of Wilson's requested job adjustments.  First, Wilson's disability required an inexhaustible amount of leave. Indeed, by February 2017, Wilson had used 445.9 hours of FMLA leave in roughly nine months, Ex.9, R.29-1, PageID#565, and she was unable to work enough hours to become re-eligible for additional FMLA leave, Ex.21, R.29-1, PageID#568.  She then used her lifetime maximum of short-term disability, Wilson Depo., R.39, Ex.31, PageID#1278, and this still was not enough.

Second, Wilson's desired unending bank of leave exceeds the Department's leave policy limits, further indicating the unreasonableness of her request.  Those policies implement Ohio law, which does not allow state employees to take unscheduled leave other than sick leave. *See, e.g.*, Amended MSJ, R.54, PageID#2445–46

(Dep't Policy HR-22 Rule 1.12, 2.7); Ex.4, R.27-1, PageID#228 (Dep't Policy HR-15(H)); Ohio Admin. Code 123:1-32-02. Wilson's Collective Bargaining Agreement also required 48-hours' prior notice for using personal leave and prior approval for vacation leave. Ex.M, R.54, PageID#2384–85, 2387. So any request for untimed and unscheduled leave is inconsistent with the Department's policies.

Third, the chronic nature of Wilson's disability made forever uncertain whether her symptoms would decrease in frequency and severity enough for her to work full-time as she had prior to spring 2016. Wilson was never able to advise the Department when or if she would be able to function as an external auditing team member again, even when the Department sent her ADA paperwork and followed-up to offer help in completing it. Wilson Depo., R.39, PageID#1112; Ex.33, R.39-2, PageID#1274–75, 1282–83.

Stepping back from the three *King* factors illuminates even more problems with Wilson's request. The Department was not obligated to offer still more leave than Wilson enjoyed before termination. The Department worked with Wilson for more than two years and four months after her symptoms first required FMLA leave in May 2016 and more than one year and six months after she began short-term disability in March 2017, but her condition did not improve. In comparison, a decision of this Court affirming summary judgment for an employer rested on the Court's

23

observation that automatic termination of employees whose medical conditions do not improve after one year is "rather standard." *Melange v. City of Ctr. Line*, 482 F. App'x 81, 86 (6th Cir. 2012) (citing *Walsh*, 201 F.3d at 727 & n.4 and *United Paperworkers Int'l Union v. Inland Paperboard & Packaging, Inc.,* 25 Fed. App'x 316, 319 (6th Cir. 2001)).  Yet the Department continued working with Wilson well beyond one year.

Furthermore, her request, if granted, would require the remaining members of her audit team to complete much of her auditing work for her.  Lin Decl., R.54-1, ¶7, PageID#2329–30.  But "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000).  Wilson's request unreasonably sought to shift the task of auditing—an essential function of external auditors if anything is—onto her teammates.

One loose end remains about the nature of Wilson's possible accommodations.  Wilson identifies myriad exchanges that she labels "accommodation(s)" requests.  Ex.38, R.39, PageID#1308–09.  As Wilson acknowledges, however, her "requested accommodations were not discrete, unrelated acts."  Wilson Br. 30.  None of these alleged requests is separate from Wilson's unlimited-leave demand, and they would be unreasonable if they were separate.  All are either (1) too vague to

stand separate, such as "request[ing] in general terms an accommodation," (2) post-hoc requests to excuse individual absences using personal or vacation leave, or (3) requests for remote work or flextime that Wilson and her doctor agree she could not perform.   Ex.38, R.39, PageID#1308–09; Wilson Depo., R.39, PageID#992; Dr. Amann Decl., R.47-1, ¶9, PageID#2256.   The categories collapse together upon examination.

Requests in the first category do not merit separate analysis because they do not identify a "specific accommodation." *Kirilenko-Ison*, 974 F.3d at 670 (quoting *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998)).   These requests "simply did not impose an obligation to offer accommodations" because they did not identify a need arising from a specific medical diagnosis identifying a specific accommodation for a specific need. *Kaltenberger*, 162 F.3d at 437.   They served only to remind the Department of Wilson's demand for an unrestricted license to call-off whenever her symptoms required.   That demand is unreasonable under the above analysis, although it is a separate question whether these statements may have been sufficient to trigger the Department's duty to participate in an informal interactive process. *See* below at 27–30.

The second category involves forms of leave that would not have covered Wilson's absences unless transformed into the unlimited, unscheduled leave that

Wilson demanded. Wilson Depo., R.39, PageID#1118. Wilson did not have enough sick, vacation, and personal leave combined to cover even the first absence that violated her last-chance agreement. Amended MSJ, R.54, PageID#2405–06. This hypothesized accommodation is also unreasonable because it would require the Department to exempt Wilson indefinitely from Department policies, Ohio laws, and her Collective Bargaining Agreement, all of which require prior notice of vacation and personal leave, *see* above at 23–24.

The third category consists of nothing but disguised requests for infinite time off because Wilson agrees she cannot work from any location when her symptoms strike, nor work enough flextime to make up the hours her disability forces her to miss. Wilson Depo., R.39, PageID#992, 1118; *see* Dr. Amann Decl., R.47-1, ¶9, PageID#2256. Flextime not mandated by the Department's operational need also violates Department policy. Ex.2, R.27, PageID#205 (Dep't Policy HR-14).

To this day, Wilson has not identified a "reasonable" accommodation—that is, one that would enable her to meet the essential functions of reliable attendance and on-schedule completion of auditing tasks.

## II. Even if Wilson was a "qualified individual," her claims still fail because she broke-off the interactive process.

Independent of whether Wilson was qualified for the external auditor position, her voluntary withdrawal from the process of identifying a feasible accommodation

defeats her federal failure-to-accommodate claim and, by extension, her wrongful-termination claims too.  This analytical route features more twists and turns, but it too arrives at affirming the district court.

## A. Wilson's own conduct defeats her federal failure-to-accommodate claim.

When a plaintiff proposes an accommodation, the employer is not obliged to immediately accept the proposal, but only to initiate an "interactive process" to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. §1630.2(o)(3)).  This Court has "consistently held that an employer is not obligated to provide accommodation until the plaintiff ha[s] provided a proper diagnosis of her disability and requested specific accommodation." *Kirilenko-Ison*, 974 F.3d at 670 (quotation and brackets omitted).  "[W]hen a plaintiff voluntarily withdraws from the interactive process based on a defendant's request for verification, the plaintiff fails to show that the defendant denied her requests for accommodations."  *Id.*  Here, the Department worked with Wilson to address her disability and found ways to excuse each of her absences until well after she voluntarily withdrew from the accommodation process by refusing to submit ADA-request paperwork and medical documentation.  So Wilson's federal failure-to-accommodate claim presents no triable question.

27

To recapitulate, Wilson mentioned an "ADA reasonable accommodation" for the first time on March 5, 2018.  Ex.29, R.39-2, PageID#1274; Ex.38, R.39-2, PageID#1308.  For the previous few months, the Department had been working with Wilson to manage her symptoms using FMLA and short-term disability, hoping her symptoms would stabilize to pre-2016 levels once Wilson adjusted to the December 2017 death of her longtime physician.  *See* Wilson Depo., R.39, PageID#1016–17, 996.  By March 7, the Department's ADA coordinator had emailed Wilson paperwork so she could describe the accommodation she wanted to request and provide physician confirmation of its appropriateness.  Ex.33, R.39-2, PageID#1283.  Wilson never filled it out, breaking off the interactive process and thereby dooming her failure-to-accommodate claim.  *See Kirilenko-Ison*, 974 F.3d at 670.  Wilson might have reopened the process at any time by completing the paperwork, but she had already decided against "[g]oing through that route."  Wilson Depo., R.39, PageID#1131.

Even if one assumes that Wilson made an accommodation request before March 5, the Department had accommodated her through FMLA and short-term disability, and never disciplined Wilson for any absence before then.  *See id.* at 1053–56.  "[A]n employee cannot make h[er] employer provide a specific accommodation if another reasonable accommodation is instead provided."  *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) (quotation omitted).  So, by giving Wilson

accommodations other than what she may have preferred, the Department partici-pated in good faith in the interactive process regardless of when it started. And the Department continued to accommodate Wilson until long after she had voluntarily ended the interactive process and after she accumulated unexcused absences despite her accommodations.

### B. Wilson's own conduct also defeats her wrongful-termination claims.

Wilson's withdrawal from the interactive process precludes her wrongful-ter-mination claims even if she were "otherwise qualified." Showing why requires a distinction between the direct- and indirect-evidence frameworks for proving wrong-ful termination. That distinction becomes necessary only if this court decides Wil-son was "otherwise qualified." If the Court agrees she was not, the Court need not choose between frameworks because both require prima-facie evidence of that ele-ment. *See Bledsoe*, 42 F.4th at 578.

If the Court holds Wilson was "otherwise qualified," then a failure to accom-modate would be direct evidence proving discriminatory firing if, as Wilson alleges, the failure caused the firing. Order on MSJ, R.58, PageID#2627 (citing *McPherson*, 119 F.3d 460). But that road is closed to Wilson because her withdrawal from the interactive process means there was no failure to accommodate, *Kirilenko-Ison*, 974 F.3d at 670, and that alleged failure was the only direct evidence supporting her

29

wrongful-termination claims, *see* Order on MSJ, R.58, PageID#2629–30 (granting summary judgment on these claims because Wilson withdrew from interactive process).

If "otherwise qualified," however, Wilson could still theoretically support these claims through indirect evidence under the familiar *McDonnell Douglas* framework. *See Bledsoe*, 42 F.4th at 581. But she has not done that because she offers no prima-facie evidence of the "solely by reason of" element of wrongful termination. *See Doherty*, 862 F.2d at 573; 29 U.S.C. §794. That would require showing that no legitimate reason played any role whatsoever in the Department's termination decision. Wilson does not even make that argument. Thus, even if Wilson were "otherwise qualified," her withdrawal from the interactive process would still defeat all her claims because she put all her wrongful-termination eggs in her failure-to-accommodate basket.

### III. The statute of limitations bars Wilson's federal failure-to-accommodate claim.

Merits aside, Wilson missed the two-year window to file her federal failure-to-accommodate claim. The Sixth Circuit applies "Ohio's two-year statute of limitations governing personal injury actions to Ohio cases arising under … the Rehabilitation Act" because the Act does not have its own statute of limitations. *J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 292 (6th Cir. 2019). Federal law determines

when the limitations period starts. *Id.* It starts when the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)).

Applying that law to the present facts shows that time ran out on Wilson's federal failure-to-accommodate claim before she asserted it. Wilson filed her complaint on December 3, 2020, so she cannot recover for claims that accrued before December 3, 2018. Compl., R.1, PageID#1. Wilson identifies more than a dozen alleged requests for an accommodation, the latest occurring "[o]n or about October 12, 2018." Ex.38, R.39-2, PageID#1309. Wilson also alleges that the Department denied all but one of these. Wilson Depo., R.39, PageID#1088–89, 1100–02, 1113–14, 1117–18, 1153–55. Wilson further alleges that she learned of all these alleged denials while she was working. *Id.* And she stopped working in October 2018. *Id.* at 1139–40. All agree, then, that Wilson learned of the alleged denials prior to her termination on December 3, 2018, and therefore outside the limitations period. Wilson may not assert a Rehabilitation Act claim for failure to accommodate her.

## IV. State sovereign immunity allows this Court an alternate path to affirm the district court's rulings on Wilson's state-law claims, but the Court should affirm for the reasons the district court provided.

Although Ohio's sovereign immunity presents "a true jurisdictional bar" that usually insulates state entities from suit in federal court, *Russell v. Lundergan-Grimes*,

784 F.3d 1037, 1045 (6th Cir. 2015), it does not bar federal courts from considering Wilson's state-law claims on the merits because neither party has raised state sovereign immunity prior to this brief.  Sixth Circuit caselaw offers alternative explanations for why this posture allows federal courts to consider the merits, but this Court should affirm regardless of whether it follows the prevailing or outlier view.

### A.  The Court should affirm under the prevailing view.

Under the prevailing view in this Circuit, "a sovereign-immunity defense may be asserted for the first time on appeal," *Cady v. Arenac Cnty.*, 574 F.3d 334, 345 (6th Cir. 2009) (quoting *Nair v. Oakland County Cmty. Mental Health Auth.,* 443 F.3d 469, 474 (6th Cir. 2006)); *Timmer v. Michigan Dep't of Com.*, 104 F.3d 833, 836 (6th Cir. 1997), but when "a state does not invoke sovereign immunity as a threshold defense," usually through a Rule 12(b)(1) motion to dismiss, courts "may address the sovereign-immunity defense and the merits in whichever order [they] prefer." *Does 1-5 v. Whitmer*, 69 F.4th 300, 305 (6th Cir. 2023).  Here, because the Department did not raise its sovereign immunity in district court, this Court may treat immunity as a defense "that arises only if the sovereign would otherwise lose on the merits." *Nair*, 443 F.3d at 476.

Under that approach, the Court should affirm the district court's merits ruling for the Department on Wilson's state wrongful-termination claim for the reasons

above.  Or, if the Court finds a material factual question on that claim, the Court should dismiss the claim because federal courts lack jurisdiction to award Wilson relief on it.  And the district court had discretion to decline supplemental jurisdiction over Wilson's state failure-to-accommodate claim after addressing its timeliness, rather than choosing to dismiss on sovereign immunity at the outset.

### B.  Wilson is entitled to no relief under the outlier view.

One panel decision contradicts, or perhaps qualifies, earlier and later cases recognizing that, because sovereign immunity is a true jurisdictional bar—a constitutional limit on federal courts' power—States may raise it for the first time on appeal.  The panel in *Ku v. Tennessee* held that the Volunteer State had waived its immunity defense by raising it only after the State "appeared without objection to the district court's jurisdiction … engag[ed] in substantial discovery and fil[ed] a[n unsuccessful] motion for summary judgement" on the merits.  322 F.3d 431, 432 (6th Cir. 2003).  *Ku* may remain valid where a state entity conducts extensive discovery before raising its immunity.  After all, this Court has never reversed *Ku* and, on the contrary, quoted its holding in an opinion that also affirmed the proposition that "a sovereign-immunity defense may be asserted for the first time on appeal."  *Nair*, 443 F.3d at 474.

Under *Ku*'s apparently outlier view, the Department has waived Ohio's immunity from suit in federal court by engaging in extensive discovery before raising immunity. If the Court takes that view, it should reach the merits and affirm the district court for the reasons above. That would include affirming the district court's discretionary decision to decline supplemental jurisdiction over Wilson's state failure-to-accommodate claim.

## V.    Wilson's counterarguments are unavailing.

Wilson's brief hides from the dispositive issue of not being "otherwise qualified," which defeats her claims even if her counterarguments were correct. In any event, neither are the counterarguments correct.

### A. Wilson offers no counterargument that she was "otherwise qualified."

Wilson's brief never identifies the elements of her claims because she cannot establish the element that all her claims share. She had to make a prima-facie case that she was "otherwise qualified" for her position. *Kirilenko-Ison*, 974 F.3d at 669. That requires her to show she could "perform the essential functions of the employment position" if given "a reasonable accommodation." 42 U.S.C. §12111(8). And an accommodation that "remov[es] an essential function from the position … is *per se* unreasonable." *Ford Motor*, 782 F.3d at 761 (quotation and brackets omitted).

Wilson tries to jump over this requirement and get to her argument that the Department broke-off the interactive process of finding an accommodation. *See* Wilson Br. 17–18. But she cannot make that leap because "[i]n this circuit, failure to engage in the interactive process does not give rise to an independent claim." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 525 (6th Cir. 2021) (citing *Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013)). Instead, it becomes relevant "only if the plaintiff establishes a prima facie case of failure to accommodate." *Id.* To establish her prima facie case, Wilson would have to identify an accommodation that would allow her to perform the essential functions of reliable attendance and on-time completion of auditing tasks. Since Wilson cannot do so, *see* above at 22–27, and makes no attempt to argue otherwise, Part B of her brief does nothing to advance her claims, *see* Wilson Br. 17–27.

## B. Had Wilson stated a prima-facie case, she still could not avoid responsibility for the breakdown in the interactive process.

Had Wilson been "otherwise qualified" for the external auditor position, her argument that the Department would be liable because it caused the interactive process to break down would still fail. Recall that a plaintiff has not completed her role in the interactive process "until the plaintiff ha[s] provided a proper diagnosis of her disability and requested specific accommodation." *Kirilenko-Ison*, 974 F.3d at 670 (quotation and brackets omitted). Here, Wilson never identified an accommodation

35

that would allow her to perform the essential job functions of external auditors, *see* above at 22–27.  Instead, she "voluntarily withdr[ew] from the interactive process based on [the] defendant's request for verification" that a reasonable accommodation would be possible and medically necessary, *Kirilenko-Ison*, 974 F.3d at 670 (citation omitted), when she refused to complete the ADA paperwork the Department sent her, *see* above at 28–29.

Wilson tries to fault the Department for the breakdown in two ways.  First, she argues that the Department never began (or unreasonably delayed) its participation in the interactive process, quoting case law and federal regulations to the effect that plaintiffs need not use "magic words" or "fill out any specific form in order for the interactive process to begin."  *E.g.* Wilson Br. 21 (quoting *Judge v. Landscape Forms, Inc.*, 592 Fed. App'x 403, 407 (6th Cir. 2014)), 24 (quoting 29 C.F.R. §1614.203(d)(3)).  The Department, however, demanded neither.  From whatever moment Wilson might claim she initiated the interactive process, the Department's response was to work with her to identify and then meet her needs.  Far from a refusal to begin the process, this conduct exemplifies the "good faith" participation that fulfills the employer's duty to engage in the interactive process.  *Kleiber*, 485 F.3d at 872.

The Department helped Wilson apply for FMLA leave and short-term disability leave. Wilson Depo., R.39, PageID#997, 1016. Anne Thomson excused two uncovered absences that came shortly after Department personnel mistakenly told Wilson she had FMLA leave available, even though Wilson admits those absences would have occurred regardless of the Department's error. *Id.* at 1053–55. The Department promptly responded to Wilson's request for an ADA accommodation and followed-up after weeks of silence from Wilson. Ex. 33, R.39-2, PageID#1282–83. Given these undisputed facts, the Department allowed the process to begin, and Thomson's conduct never undercut the Department's good-faith participation.

Second, Wilson argues the Department obstructed or ended the interactive process. It did so, Wilson says, when it did not acquiesce immediately to her post-hoc requests for exemptions from Department policies, state laws, and her Collective Bargaining Agreement, all of which require prior notice for personal and vacation leave or limiting flextime to operational need. *See* above at 23–24. Even if such requests were reasonable, "an employee cannot make h[er] employer provide a specific accommodation if another reasonable accommodation is instead provided." *Hankins v. The Gap, Inc.,* 84 F.3d 797, 800–01 (6th Cir.1996) (citing *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68–69 (1986)), and the Department accommodated

Wilson with FMLA and short-term-disability leave until she exhausted the limits of both without seeing her condition improve.

The Department allegedly also obstructed the interactive process by asking Wilson to identify the accommodation she wanted and provide a physician's certification. Wilson Br. 21–24. Wilson wanted the Department to accept the medical documentation from her FMLA and short-term-disability applications that Wilson attached to her email inquiring about the ADA. *Id.* at 22; Ex.29, R.39-2, PageID#1274–75. Those documents, however, did not express physician support for any accommodation besides the FMLA and short-term disability leave that the Department did grant. Thus, her attempt to repurpose old documents did not carry her burden "to provide requested medical documentation supporting an accommodation." *Tchankpa*, 951 F.3d at 812. Since Wilson never provided that documentation, she ended the interactive process, which "precludes a failure to accommodate claim." *Id.*

Finally, Wilson argues that the Department obstructed the interactive process by not recusing Anne Thomson from the 6-member Reasonable Accommodation Review Committee that would have reviewed Wilson's request had she submitted one. *See* Wilson Br. 26–28; Ex.28, R.30-1, PageID#643 (identifying 6 panel members); Ex.1, R.30-1, PageID#640–41 (Dep't Policy HR-04 (describing Committee

operations)).  There are two reasons why Thomson's membership did not end the interactive process, even assuming she was incurably biased against Wilson.

One, the Committee was independent of Thomson.  Thomson did not control the Committee because its leader is the ADA Coordinator, not Thomson, *id.* (Dep't Policy HR-04(E)(6),(7),(9)–(11)), and Thomson would have been only one of six decisionmakers, each of whose jobs were independent of Thomson's influence, *see* Ex.28, R.30-1, PageID#643.  Two, the Department's policy provided Wilson a process to appeal the Committee's decision if she had been unhappy with it.  Ex.1, R.30-1, PageID#641 (Dep't Policy HR-04(E)(15)).  Wilson cannot critique the Department's process when she declined to even participate in that process.

## C. Wilson's federal failure-to-accommodate claim fails even under a continuing-violation theory.

Wilson's statute-of-limitations argument, if correct, would not overcome her failure to make out a prima-facie failure-to-accommodate case.  Neither is it correct.  Wilson argues that "the continuing violations doctrine" creates an "exception to the statute of limitations" here, making her otherwise-late failure-to-accommodate claim timely.  Wilson Br. 28 (quoting *Holmes v. Novo Nordisk Inc.*, 2022 WL 950015 at *2 (S.D. Ohio Mar. 30, 2022)).  She asserts that the Department's alleged unwillingness to participate in the interactive process was an ongoing violation of law not

completed "[u]ntil December 4, 2018" when Wilson learned of her termination. Wilson Br. 30.

Her own evidence uniformly contradicts that assertion. According to her deposition testimony, the Department responded to each of her requests with prompt denials made while she was working. Wilson Depo., R.39, PageID#1088–89, 1102, 1113–14, 1117–18, 1153–55; *see also* Wilson Br. 25–26. And Wilson cannot delay her failure-to-accommodate claim's accrual date beyond those denials by relying on the Department's alleged freestanding bad-faith in the interactive process because that is not itself a violation of law. *See Thompson*, 985 F.3d at 525; *Rorrer v. City of Stow*, 743 F.3d 1025 1041 (6th Cir. 2014). So the statute of limitations began to run sometime in October 2018 at the latest, shortly after her last "request" and more than two-years before she filed this lawsuit. *See* Ex.38, R.39, PageID#1308–09.

\* \* \*

The outcome of this case should be the same regardless of which road the Court chooses to take—whether it holds that Wilson was not "otherwise qualified," or that she failed to make a reasonable accommodation request, or withdrew from the interactive process. All roads lead to affirming the district court.

## CONCLUSION

For these reasons, this Court should affirm.

Respectfully submitted,

DAVE YOST
Ohio Attorney General
*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record
MICHAEL J. HENDERSHOT
Chief Deputy Solicitor General
NICHOLAS A. CORDOVA
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
Thomas.Gaiser@OhioAGO.gov

*Counsel for Appellee
  Ohio Dept. of Mental Health &
  Addiction Services*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 8,396 words. *See* Fed. R. App. P. 32(a)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2024, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## DESIGNATION OF DISTRICT COURT RECORD

Defendant-Appellee, pursuant to Sixth Circuit Rule 30(g), designates the following filings from the district court's electronic records:

***Wilson v. Dept. of Mental Health & Addiction Services*, Case No. 2:20-cv-06184**

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 12/3/2020 | R.1; 1, 7–9 | Complaint |
| 6/24/2022 | R.27; 205, 228 | Deposition of Laurie Spolarich and exhibits |
| 6/24/2022 | R.29; 491–95, 507, 561–68 | Deposition of Anne Thomson and exhibits |
| 6/24/2022 | R.30; 640–43 | Deposition of Maisha Jones and exhibits |
| 7/7/2022 | R.39; 958, 966–68, 971–73, 982–83, 992–97, 1001–03, 1010–19, 1052–56, 1077–78, 1088–89, 1099, 1100–02, 1112–18, 1131, 1139–40, 1153–55, 1184–87, 1199, 1200, 1205–07, 1239, 1274–85, 1308–09 | Deposition of Kelli L. Wilson and exhibits |
| 9/9/2022 | R.47; 2230 | Response to Motion for Summary Judgment |
| 9/9/2022 | R.47-1; 2256 | Declaration of Deborah Amann, MD |
| 3/10/2023 | R.54; 2313–2315 | Amended Motion for Summary Judgment |
| 3/10/2023 | R.54-1; 2329–32 | Declaration of Chiwayi Lin |

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 3/10/2023 | R.54-2; 2384–85, 2387 | Declaration of Vince Connor |
| 3/10/2023 | R.54-3; 2398–406, 2445–2468 | Declaration of Laurie Spolarich |
| 3/24/2023 | R.56-1; 2588 | Third Declaration of Kelli Wilson |
| 11/28/2023 | R.58; 2610–11, 2623–31 | Opinion and Order |
| 11/28/2023 | R.59; 2633 | Judgment Entry |
| 12/7/2023 | R.60; 2634 | Notice of Appeal |